# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| ASHLEY EGGL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-310 |
| | ) | |
| CHOSEN HEALTHCARE, d/b/a | ) | |
| NORTH RIDGE VILLAGE NURSING | ) | |
| and REHABILITATION CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendant

Chosen Healthcare, d/b/a North Ridge Village Nursing and Rehabilitation Center ("NRV") on

January 3, 2020 (ECF No. 23). Plaintiff Ashley Eggl filed a response in opposition on May 5,

2020 (ECF No. 40), and NRV filed its reply on June 16, 2020 (ECF No. 46).[1] For the reasons set

forth below, the motion is GRANTED in part (as to Plaintiff's Pregnancy Discrimination Act

claim), DENIED in part (as to Plaintiff's FMLA claims), and DENIED AS MOOT in part (as to

Plaintiff's post-employment retaliation claim).

## BACKGROUND

Ashley Eggl filed this lawsuit against NRV, her former employer, alleging that NRV

discriminated against her in violation of Title VII, as amended by the Pregnancy Discrimination

---

[1] The briefing schedule on the motion for summary judgment was extended numerous times at the request of the parties for several reasons, including due to the impact of the COVID-19 pandemic.

Act, and the Family and Medical Leave Act. Amended Complaint (ECF No. 16), p. 2.[2] The

following facts are undisputed, except for a few immaterial ones, and taken verbatim from Eggl's

Amended Complaint (which in turn is taken verbatim from her initial Charge of Discrimination):

> Plaintiff worked for Defendant as a CNA/healthcare provider from April 28, 2016
> up to October 17, 2017 at which time she was terminated. Plaintiff's last day of
> work was October 4, 2017. Prior to her termination, Plaintiff was pregnant and her
> due date was October 9, 2017 (she did not deliver until October 11, 2017).
> Plaintiff filled out FMLA paperwork and provided it to Defendant on October 4,
> 2017. The FMLA paperwork indicated that Plaintiff's period of incapacity would
> be from October 9, 2017 through November 21, 2017. Around October 6, 2017,
> Plaintiff received a telephone call from Defendant's HR representative who
> indicated that a resident and/or family member complained that Plaintiff had made
> the resident use a bed pan. Plaintiff replied that she and all CNA's on third shift
> had that particular resident use a bed pan because she was so unstable and unable
> to bear weight. Plaintiff was suspended pending an investigation. This was about
> one week before Plaintiff was to deliver her baby and go on FMLA leave. Plaintiff
> was scheduled to work October 7, 8, and possibly the 9th–but she did not work
> because of the suspension. Plaintiff went into the Hospital on October 9, 2017 to
> be induced, and her baby was born on Wednesday October 11, 2017. Plaintiff
> received a phone call around October 13, 2017 indicating that she was to fax her
> short term disability ("STD") paperwork and FMLA paperwork, and Plaintiff
> talked with the HR representative (Heather Willett) to get the fax number.
> Plaintiff made arrangements for her medical provider (Women's Health
> Advantage) to fax all paper work to the employer. On October 17, 2017, Plaintiff
> was informed by Defendant that she was terminated. This was just six days after
> she had her baby and just days after she had arranged for STD and FMLA papers
> to be faxed to Defendant. The stated reasons for termination were alleged prior
> complaints from the resident about the bedpan–although Plaintiff was not aware
> of them–and Defendant also claimed that she was terminated for other vague
> violations of "state regulations[."] When Plaintiff pressed what that meant,
> Defendant's representative could not explain it. Plaintiff had never received any
> write ups or prior discipline regarding performance[.]

---

[2] Eggl also asserted in her Amended Complaint that she was retaliated against *after* she
was fired, alleging that NRV interfered with her ability to obtain subsequent employment.
However, in her brief in opposition to summary judgment Eggl states: "After further review of
the Plaintiff's evidence and claims of post termination retaliation, the Plaintiff has determined
she will not be [proceeding] further with that claim." Plaintiff's Memorandum in Opposition
(ECF No. 40), p. 18. Accordingly, NRV's motion for summary judgment as to Eggl's claim of
post-termination retaliation is DENIED as moot.

Amended Complaint, pp. 2-5. Based on these facts and allegations, Eggl claims that:

> Defendant's stated reasons for terminating her were false, fictitious, and
> pretextual. Plaintiff contends that the real reasons for termination were because of
> her gender/sex (being female/pregnant) and her request for FMLA leave.
> Plaintiff's termination was discriminatory and retaliatory for requesting her
> federal rights to time off of work for her pregnancy in violation of Title VII and
> the FMLA. Plaintiff's termination further interfered with her receipt of FMLA
> benefits. Plaintiff claims that she has been retaliated against and that Defendant
> has interfered with her employment relationships.

*Id.*, p. 5.[3]

NRV includes in its brief in support of its motion a Statement of Undisputed Material

Facts, which adds a host of additional relevant facts and much more context. This recitation of

facts includes the following:

> Defendant hired Eggl as a CNA on April 28, 2016. Eggl's duties included
> toileting and showering residents, and changing their clothing.
>
> On September 26, 2017, NRV received a Concern Report regarding Eggl. The
> Concern Report included several allegations of mistreatment, including but not
> limited to, failure to properly toilet the resident, leaving the resident naked in bed,
> leaving the resident on the bedside commode, and failing to timely respond to the
> resident's call light.
>
> On October 6, 2017, NRV advised Eggl of the complaint against her. During this
> call, Eggl was advised she was suspended pending the conclusion of an

---

[3] Eggl's Amended Complaint contains an incorrect statement. She writes that "[a]fter the
filing of her initial Charge [of Discrimination], Plaintiff was terminated on or about October 17,
2018, and she filed an additional Charge of Discrimination . . . on or about October 10, 2018[.]"
Amended Complaint, pp. 1-2. So the record is clear, Eggl was terminated on October 17, 2017,
not 2018, and her first Charge of Discrimination was filed on December 4, 2017, about seven
weeks *after* she was fired. The reference to Eggl's termination date was likely a scrivener's error,
since it is undisputed that she was fired on October 17, 2017; the statement that she was fired
*after* filing her initial Charge is simply wrong. *See* Amended Complaint, Plaintiff's Exh. A,
Charge of Discrimination dated December 4, 2017 (ECF No. 16-1). Eggl's second Charge of
Discrimination was, as she states, filed on October 10, 2018. *Id.*, Plaintiff's Exh. C, Charge of
Discrimination (ECF No. 16-3). This second Charge is the one in which Eggl asserted her now
abandoned claim for *post*-termination retaliation (see footnote 2 above).

investigation. It was NRV's standard practice to suspend employees when an allegation of resident abuse was made. NRV investigated the Concern Report regarding Eggl. Eggl understood suspension pending investigation to be NRV's normal response to a complaint of resident abuse.

On October 6, 2017, NRV interviewed the resident's daughter, the resident, and Eggl. The resident's complaint asserted that Eggl became verbally abusive toward the resident regarding use of a bedpan, among other issues. Specifically, the resident complained that Eggl angrily told her to use the bedpan and that Eggl would not be returning to help her use the restroom again that night.

On October 6, 2017, Kelly Agee, Assistant Director of Nursing, spoke with the resident's daughter regarding the bedpan incident. Agee promptly notified NRV's Human Resources Representative, Heather Willett, about the Concern Report. In accordance with the abuse and neglect policy, Willett immediately placed Eggl on suspension pending an investigation. Willett launched her investigation into the report of abuse made by the resident's daughter on October 6, 2017. Willett and NRV's Administrator, Mark Gephart, called the resident's daughter. The resident's daughter, consistent with her call with Agee, described the events surrounding her report of verbal abuse.

Next Willett interviewed the resident. The resident explained to Willett she did not want to say anything about her mistreatment. She neither confirmed nor denied Eggl had subjected her to inappropriate treatment. Based on the resident's body language and comments, Willett sensed that the allegations had merit, but that the resident was afraid of retaliation.

Then Willett and Gephart called Eggl. They questioned Eggl about the allegations, which Eggl denied. Willett informed Eggl she was being suspended pending an investigation pursuant to company policy.

Willett interviewed the resident for a second time on October 8, 2017. Willett informed the resident that the state required NRV to take appropriate action to investigate all allegations of abuse and neglect. The resident then confirmed that Eggl had been verbally abusive towards her. Based on its investigation, NRV understood that Eggl had become angry at the resident when the resident expressed a desire to use the restroom rather than a bedpan. NRV further understood, based on its investigation, that Eggl had told the resident she would not be returning to assist the resident with using the restroom again that night.

Willett concluded that the evidence substantiated the allegations of residential abuse and recommended Eggl's termination. Willett presented this information to the Director of Human Resources, Wendy Schippers. After Schippers reviewed

the relevant information, Heather Willett and Mark Gephart terminated Eggl's employment on October 17, 2017.

At that time, Steve Gyovia was the Director of Nursing. Eggl does not believe that Mr. Gyovia knew she was pregnant. Mark Gephart was the Facility Administrator at this time. Eggl does not believe Mr. Gephart knew she was pregnant. Wendy Schippers was the Director of Human Resources. Eggl does not believe Ms. Schippers knew she was pregnant.

Eggl testified she asked Ms. Willett about FMLA paperwork around September 20, 2017. She further testified that on October 4, 2017, she handed Heather Frost the FMLA paperwork. Ms. Frost was the Scheduler for North Ridge Village. On November 6, 2017, Eggl's healthcare provider, Women's Health Advantage, faxed Defendant a copy of Eggl's completed FMLA paperwork. Eggl is unsure why this paperwork was sent on November 6, 2017. Eggl did not discuss with anyone the duration of her leave request.

The articulated reason Eggl gave to support her contention that her termination was pretextual was simply that she was pregnant and going on FMLA leave. . . .

Eggl testified that other CNAs on third shift had the complaining resident use a bedpan. Specifically, she alleged that Taylor, Marilyn, Christina, Melissa, Megan, Nichols, and Ashley all made the resident use the bedpan. Eggl never actually observed Taylor use a bedpan. Instead, she based this testimony on hearsay evidence. As for the other CNAs, Eggl testified she personally observed them use a bedpan.

Defendant's Brief in Support (ECF No. 24), pp. 2-5 (internal citations to record omitted[4]).

## STANDARD OF REVIEW

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the

---

[4] The omitted internal citations were to documents included in NRV's Appendix in support of its motion (ECF No. 25) and include: Eggl's deposition (ECF No. 25-1); NRV's responses to Eggl's discovery requests (ECF No. 25-2); and NRV's internal investigation memo (ECF No. 25-3), all of which the Court has reviewed, along with the Plaintiff's Appendix (ECF No. 39) filed with her response brief.

moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc.*, 2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id*. (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Id*. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice." *Id.* (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the mere scintilla of evidence." *Id.* (citing *Grant*, 870 F.3d at 571).

The Seventh Circuit in recent years has refined the summary judgment standard of review in employment discrimination cases, explaining as follows:

> On top of the normal lattice of summary judgment demands, we must also apply the constructs of employment discrimination law. For years we have tangled with a "rat's nest of surplus tests" in employment discrimination cases–struggling to pigeon hole evidence into the direct or indirect method with various overlaying requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). Our Circuit has now clarified the singular question that matters in a discrimination case: "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

*Johnson*, 892 F.3d at 893-94.

## DISCUSSION

### I. Pregnancy Discrimination Act Claim.

Title VII prohibits discrimination on the basis of sex, including discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). To prevail on a claim under the PDA, a plaintiff must establish that her pregnancy was the reason for her

termination. As NRV points out, "Eggl has presented no direct evidence that she was terminated based on her pregnancy[]" and so "she must proceed under the *McDonnell-Douglas*" burden-shifting framework. Defendant's Brief, p. 6 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[5] To establish a *prima facie* case under the PDA, "the burden is on plaintiff to demonstrate that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated non-pregnant employees were treated more favorably)." *Rollins v. Bon-Ton Dep't Stores*, 2018 WL 4216822, at *2 (N.D. Ind. Sept. 4, 2018) (citing *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 736 (7th Cir. 2011)). "If plaintiff establishes these elements, the burden shifts to the defendant to provide a non-invidious reason for the adverse action. . . . If a legitimate reason is produced, plaintiff must then prove that the reason was pretextual. . . ." *Martinez v. NW. Univ.*, 173 F.Supp.3d 777, 785 (N.D. Ill. 2016) (internal citations omitted).

NRV insists that "Eggl's claim fails under the first, second, and fourth prongs of the

---

[5] In *Ortiz v. Werner Enterprises*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit "warned district courts not to split evidence into categories of 'direct evidence' and 'indirect evidence,' but to instead evaluate the evidence as a whole to determine if it 'would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Lewis v. Wilkie*, 909 F.3d 858, 866-67 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d 760, 764-65). The *Ortiz* decision, though, "did not reject or alter the *McDonnell Douglas* burden-shifting framework . . . ; [it] simply clarified that there are not separate classifications of evidence to be evaluated under different standards, and [it] eliminated unhelpful surplus tests." *Id.* (citing *Ortiz*, 834 F.3d at 766); *also* citing *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) ("Nothing in Ortiz . . . displaced the burden-shifting analysis established in *McDonnell Douglas*."). Both parties utilize the burden-method in this case so the Court does likewise.

analysis." Defendant's Brief, p. 6. Her claim fails, according to NRV, because: 1) the decision makers who terminated Eggl did not know she was pregnant; 2) she was *not* satisfactorily performing her duties; and 3) she cannot point to any comparators not in her protected class who were treated more favorably. *Id*., pp. 7-10. NRV insists that it fired Eggl for one reason and one reason only: because of a substantiated report of resident abuse. NRV further contends that Eggl presents no evidence to refute the company's proffered reason for her termination. *Id*., pp. 10-11. Based on the facts and evidence presented–or rather, the lack of evidence, as discussed below–Eggl fails to establish the necessary elements of a *prima facie* case of pregnancy discrimination, and that is fatal to her claim.

NRV argues that "Eggl's pregnancy discrimination claim fails the first prong of the analysis as she has not shown that any decision-maker knew she was pregnant." *Id*., p. 7. Accordingly, her pregnancy discrimination claim is not viable since a "claim of pregnancy discrimination 'cannot be based on [a woman's] being pregnant if [the employer] did not know she was [pregnant].'" *Id*. (quoting *Miller v. Am. Family Mut. Ins. Co*., 203 F.3d 997, 1006 (7th Cir. 2000)); *see also*, *Griffin v. Sisters of Saint Francis, Inc*., 489 F.3d 838, 844 (7th Cir. 2007) (the initial prong of the *prima facie* case requires proof that the plaintiff was pregnant and that the employer knew of the pregnancy).

As NRV points out, Eggl presents no evidence that the decision makers who fired her were aware of her pregnancy. NRV states that "[o]n October 17, 2017, Heather Willett and Mark Gephart terminated Eggl's employment. . . . Mark Gephart was the Facility Administrator at this time. . . . Eggl does not believe Mr. Gephart knew she was pregnant. . . . Wendy Schippers was the Director of Human Resources. Eggl does not believe Ms. Schippers knew she was pregnant. .

9

. . Eggl has not identified any decision-maker regarding her termination that knew she was pregnant. Thus, her claim fails as a matter of law." *Id*. In fact, Eggl testified as follows in her deposition:

> Q. Did you ever interact with Mark Gephart while you were employed [at NRV]?
>
> A. No.
>
> Q. Did Mark Gephart know you were pregnant?
>
> A. I don't think so. Because I never ran into him, ever.
>
> Q. So I take it you have never spoken to Mark Gephart?
>
> A. No.

Eggl Deposition (ECF No. 25-1, p. 19). As to Schippers, the second decision maker, Eggl testified as follows:

> Q. . . . Do you know if Wendy Schippers knew that you were pregnant?
>
> A. I want to say, no. But yes, because after the termination, she knew, I'm assuming. I don't know if she was prior to that, because I never seen [sic] her. She was in Indianapolis. So I don't–I don't know.

*Id*.

According to NRV, because Gephart and Schippers were unaware of Eggl's pregnancy, their decision to terminate her could not have violated the PDA and NRV is entitled to judgment as a matter of law on that claim.

Eggl responds to this argument by insisting that even though the ultimate decision makers, Gephart and Schippers, were not aware of her pregnancy, they nonetheless wrongfully terminated her based on *Willett's* bias. As Eggl states it, "[t]he evidence shows that Willett was fully aware of Eggl's pregnancy at the time of the suspension and termination decisions as well.

10

In September and October 2017 Eggl was also very large and visibly pregnant. Eggl talked to Willett about the pregnancy and her upcoming childbirth prior to her suspension or termination, and again on October 6th and October 9th." Plaintiff's Memorandum in Opposition (ECF No. 40), p. 5. Eggl insists that the ultimate decision makers–Schippers and Gephart–were manipulated by Willett into making a discriminatory termination decision. Eggl's theory goes like this:

> [E]ven if hypothetically Shippers was not subjectively aware of the pregnancy before Eggl was terminated, there is still sufficient evidence to conclude that Willett, who did know of the pregnancy and request for FMLA leave for the child birth, . . . manipulated Schippers like a proverbial cat's paw, to go along with the decision to terminate Eggl.

*Id*., p. 6. According to Eggl:

> The evidence points directly to Willett's input as the proximate cause of the termination decision. Willett is the only individual the Defendant identified as conducting an investigation into any allegations against Eggl[.] . . . It was also Willett that made the decision to suspend Eggl, and Willett was the only individual besides Schippers that participated in the termination decision.

*Id*.[6] The Court finds that Eggl's "cat's paw" theory fails, which in turn means she fails to establish the first element of her *prima facie* case for pregnancy discrimination and NRV is

---

[6] It is undisputed that Mark Gephart also "participated," at least to some extent, in Eggl's termination and in the investigation that led up to it. Eggl conceded this in her deposition. Eggl Deposition, Defendant's Exh. 1 (ECF No. 25-1), p. 23 (internal page number 83) ("And then October 17th, is when I talked to [Willett]–her and Mark Gephart. And they terminated me, over the phone."); p. 27 (internal page numbers 98-99) (testifying that ". . . I got a call back, and it was–it was Heather Willett. And Heather Willett said that she had Mark Gephart in the room with her and I was on speaker phone, and they were sorry to do this, but . . . that they would have to terminate me."). Eggl also does not dispute that on October 6, 2017, Gephart and Willett, together, called the family member who had lodged the Concern Report to discuss her allegations, or that Willett and Gephart, together, called Eggl on that same day to get her side of the story. *See* Defendant's Exh. 3, Investigation Report (ECF No. 25-3), p. 2. While it is unclear whether Gephart was one of the ultimate decision makers along with Willett and Schippers, it is undisputed that he was involved in the investigation and participated in the phone call with Willett and Eggl when Eggl was fired. Regardless of his level of involvement, Eggl implicitly argues that he, like Schippers, was manipulated like a "cat's paw" by Willett.

entitled to summary judgment on that claim.

As the Seventh Circuit has explained, a "cat's paw" theory applies "'when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018), reh'g denied (July 24, 2018) (quoting *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015)).[7] The law is well established that to succeed on a cat's paw theory, "[t]he plaintiff must provide 'evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action.'" *Id*. (quoting *Johnson v. Koppers, Inc*., 726 F.3d 910, 914 (7th Cir. 2013)). A cat's paw theory requires [the plaintiff] to show that [a biased supervisor] "'actually harbored discriminatory animus against him.'" *McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 370 (7th Cir. 2019) (quoting *Grant v. Trustees of Indiana Univ*., 870 F.3d 562, 570 (7th Cir. 2017) (in turn quoting *Nichols v. Michigan City Plant Planning Dept*., 755 F.3d 594, 604 (7th Cir. 2014)). "[Plaintiff] must also show that [the biased supervisor's] 'input was a proximate cause' of the adverse actions against him." *Id*. Eggl fails to establish either of the two prongs of a cat's paw theory. She presents no evidence at all to support her theory, which is based solely on assumptions, conjecture and conclusions.

---

[7] "The name [cat's paw theory] is based on an old fable in which a scheming monkey convinces an unwitting cat to fetch roasting chestnuts from a fire. The cat burns its paw and the monkey gets the chestnuts. In employment discrimination cases, the 'cats paw' is the unwitting manager . . . who is persuaded to act on another's illegal bias." *Gonzalez v. Tape Case Ltd.*, 2018 WL 3574754, at *3 (N.D. Ill. July 25, 2018).

Eggl's cat's paw theory fails right out of the gate because she presents no evidence that Willett "actually harbored discriminatory animus" against her. Eggl presents no evidence of any comments, actions or conduct by Willett that even hint that Willett harbored animus against Eggl because Eggl was pregnant. In fact, Eggl does not even *argue* that Willett treated her any differently after learning that Eggl was pregnant, a fact that Willett was aware of for months given that the two women worked together regularly and Eggl was visibly pregnant for months before her termination. Since she cannot establish the first prong of a cat's paw theory, Eggl's argument fails as a matter of law.

A review of other cases addressing the issue of discriminatory animus makes clear why Eggl's cat's paw theory is unavailing. In *Johnson v. Koppers, Inc.*, the Seventh Circuit explained that "[i]n order to succeed under the cat's paw theory, Johnson needs to show that O'Connell, motivated by discriminatory animus, concocted a false story about Johnson, and that O'Connell's story was the proximate cause of Johnson's termination." *Johnson*, 726 F.3d 910, 915 (7th Cir. 2013). The Court held that Johnson failed to muster sufficient evidence of O'Connell's alleged discriminatory animus:

> Johnson argues that her claim should succeed under the cat's paw theory because her co-worker, O'Connell, harbored discriminatory animus against her race and gender. As O'Connell had no power to terminate Johnson himself, Johnson argues that O'Connell falsely reported that she called him racial and gender-based slurs on one occasion and pushed him following a separate verbal altercation, in order to induce the plant manager to terminate Johnson's employment at Koppers.
>
> . . .
>
> Even assuming O'Connell's report was false, Johnson's theory of "projection" fails because it requires a speculative inference as to O'Connell's state of mind, which is unsupported by any other evidence pointing to the existence of discriminatory animus on O'Connell's part. A false report by O'Connell, standing

13

alone, is insufficient to establish discriminatory animus. While it is clear from the record that O'Connell and Johnson did not like each other, *Johnson has provided no evidence to indicate that O'Connell's animosity was motivated by discriminatory bias against her race or gender, and we are not required to draw inferences that "are supported by only speculation and conjecture*."

*Johnson*, 726 F.3d at 914-15 (italics added). In *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984 (7th Cir. 2016), the appellate court held that the plaintiff "did not point to evidence 'that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action,' so the cat's paw theory of liability cannot save his case from summary judgment." *Id*. at 992 (quoting *Johnson v. Koppers*, 726 F.3d at 914). The Seventh Circuit noted that "[b]efore the district court–and on appeal–Bordelon relied on several pieces of circumstantial evidence that he claims give rise to an inference of Coates's age discrimination." *Id*. at 990. The Seventh Circuit affirmed the decision of the district court, concluding that the supervisor's ambiguous statements about older workers were insufficient to establish that he harbored discriminatory animus as required in an age discrimination case. In *Boston v. U.S. Steel Corp.*, 816 F.3d 455 (7th Cir. 2016), the Seventh Circuit explained as follows:

> According to Boston, Graham purposefully set her up to fail by withholding computer access, providing no more than thirteen days of training, and taking notes regarding Boston's lack of progress. Boston testified that Graham made a direct comment to Boston regarding her filing of an EEOC complaint, stating: "I'm not going to train somebody so the next time that we . . . get laid off, I get laid off. I'm not training a union person for that. I don't care what you filed." Graham testified that [Graham] was non-union and salaried. Boston claims that Graham was angry that she had to train a union employee because, in 2008, Graham was laid off and replaced by a union employee.

> Nevertheless, even after drawing all reasonable inferences in Boston's favor, Boston fails to meet her burden of proof to establish a basis for the application of cat's paw theory to her Title VII and ADEA retaliation claims. Notwithstanding Graham's stray remark, the evidence in the record as a whole is insufficient to show that Graham had a retaliatory motive or animus based on Boston's filing of

14

the October 2010 EEOC discrimination charge. *Boston is not entitled to inferences supported only by speculation or conjecture.*

*Boston v. U.S. Steel Corp.*, 816 F.3d at 466 (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (explaining that a court's favor toward the non-moving party does not extend to inferences supported by only speculation or conjecture)) (italics added).

An examination of cases in which courts have found that the plaintiff *did* present sufficient circumstantial evidence of discriminatory animus also illustrates why Eggl's theory falls short. In *Taylor v. Cook Cty. Sheriff's Office*, 2020 WL 1042040, at *5 (N.D. Ill. Mar. 4, 2020), the court determined that "Taylor has provided evidence of Ernst's *racial* animus against him. Another . . . investigator . . . testified that Ernst used racial slurs against Taylor, that 'Ernst used the N-word multiple times at Taylor's residence and called him a 'porch monkey,' and that Ernst stated 'we're [going] to get this [N-word].'" . . . In addition, Taylor testified that on the day of his Merit Board hearing . . . Ernst threatened him, telling him to quit his job using a racial slur." *Id.* In *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010), the court held that a supervisor's unusual decision to personally conduct an investigation into the plaintiff's alleged misconduct and to ignore exculpatory evidence from the person who ordinarily conducted those investigations constituted circumstantial evidence of an unlawful motive. In *Downing v. Abbott Labs.*, 2019 WL 4213229, at *11 (N.D. Ill. Sept. 5, 2019), the district court determined that "Downing has presented evidence that Farmakis treated the black managers less favorably than the white managers, made at least one racially charged comment, and relied on pretextual reasons for implementing performance management measures with respect to Downing. That combination of circumstances is sufficient to permit a jury to find that race was a

motivating factor behind the [supervisor's conduct]." Finally, in *Scheidt v. Floor Covering Assocs., Inc*., 2018 WL 4679582, at *11 (N.D. Ill. Sept. 28, 2018), the district court found that the plaintiff presented sufficient circumstantial evidence of discriminatory animus based on the following:

> . . . Plaintiff testified that sometime after she notified Defendant of her pregnancy she was moved to an office in which a vent from the bathroom released exhaust and fumes. . . . Plaintiff also testified that prior to becoming pregnant, she was friendly with Ms. Geskey–a manager at FCA–but that Ms. Geskey was not at all friendly towards Plaintiff after she became pregnant. . . . While these acts may not constitute an adverse employment action under the PDA, . . they may constitute circumstantial evidence of discriminatory animus. *See Hitchcock v. Angel Corps, Inc*., 718 F.3d 733, 741-42 (7th Cir. 2013) (holding that a "supervisor's immediate change in treatment towards [plaintiff] after learning of her pregnancy" evidenced a discriminatory animus); *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) (reversing summary judgment on retaliation claim based in part on evidence that plaintiff received "a new and unpleasant work assignment" within a month after complaints).

*Scheidt*, 2018 WL 4679582, at *11.

In the present case, Eggl presents no evidence whatsoever to establish, under her cat's paw theory, that Willett "actually harbored discriminatory animus" against her–a necessary element of her claim. She does not allege that Willett made any derogatory comments about Eggl's pregnancy or that Willett treated her differently after Eggl became pregnant. Instead, her theory is founded on speculation, conjecture and conclusions. The only allegation of animus that Eggl makes is to claim, without evidence, that when Willett interviewed the resident in question Willett engaged in "much leading and grilling" to get the resident to admit the abuse occurred. Eggl insists that "[b]ecause the resident failed to confirm any wrongdoing by Eggl in the first interview, and only indicated something occurred regarding bed pan use *when pressured into saying that* during the second interview with Willett, there is a genuine issue of material fact as

to whether the Defendant ever actually substantiated any of the allegations against Eggl[.]"
Plaintiff's Reply, p. 9 (italics added); *see also*, *id.*, p. 13 ("Only then, *after much obvious leading
and prodding from Willett*," did the resident concede that the allegations were true) (italics
added). Eggl presents no evidence at all to support this contention–it is speculative, assumptive
and conclusory all at the same time. While Eggl is entitled to have all *reasonable* inferences
drawn in her favor, she "is not entitled to inferences supported only by speculation or
conjecture." *Boston v. U.S. Steel Corp.*, 816 F.3d at 466. This is all the "evidence" Eggl musters
regarding Willett's alleged bias–her unsupported conclusion that Willett must have browbeat the
resident into saying that Eggl was abusive to her. This is wholly insufficient to support her cat's
paw theory. Eggl presents no evidence that Willett treated her differently after Eggl became
pregnant. She does not assert, for example, that Willett made derogatory comments, gave her
unfavorable job assignments, or otherwise interfered with the terms or conditions of her
employment. As stated, Eggl's only allegation against Willett is that Willett, once she learned of
the Concern Report, manipulated the situation to convince Schippers and Gephart that Eggl
should be fired. And even then, Eggl presents no evidence that those actions, assuming they are
true, were the result of discriminatory animus towards Eggl *because of her pregnancy*. Eggl
simply makes a leap in logic, and asks the Court to make the same leap, by asserting without
evidence that Willett harbored discriminatory animus *and* that the animus was due to Eggl's
pregnancy. Not only is her theory founded on conclusions and assumptions instead of evidence, it
also "requires a speculative inference as to [Willett's] state of mind, which is unsupported by any
other evidence pointing to the existence of discriminatory animus on [Willett's] part." *Johnson*,
726 F.3d at 914-15. Having failed to even raise a fact issue regarding discriminatory animus on

17

Willett's part, Eggl fails to establish the first element of a cat's paw theory, which in turn means, as NRV argues, that she fails to establish the first prong of her PDA claim[8], since the decision makers who terminated her were unaware that she was pregnant.

NRV also contends that Eggl fails to meet the fourth prong of her *prima facie* case of pregnancy discrimination because she cannot point to similarly situated, non-pregnant employees who were treated more favorably, and the Court agrees. Eggl's attempt to identify proper comparators fails because she is unable to identify any CNA who was not terminated after having been accused of abusive conduct. Instead, Eggl argues as follows:

> Eggl has identified at least three similarly situated coworkers, by name, that she witnessed using bed pans on the same resident who's daughter reportedly complained about Eggl. Two of the similarly situated employees Eggl identified were, like Eggl, CNAs. None were pregnant at the time Eggl saw them use a bed pan with the resident, and none were fired by the Defendant.

Plaintiff's Brief in Opposition, p. 9. Eggl insists that this information results in "a reasonable inference . . . that the Defendant treated Eggl more harshly and less favorably as to bed pan use, than similarly-situated non-pregnant CNAs, because only the pregnant Eggl was suspended or terminated for bed pan use." *Id*. This is all the evidence Eggl musters on this point: her contention that other, non-pregnant CNAs used bed pans for the same resident and were not disciplined or fired. The glaring problem with this argument is that it focuses only on the use of bed pans, while ignoring the undisputed fact that Eggl was the only one of those employees who was the subject of an abuse report lodged by a family member. In other words, Eggl claims that

---

[8] Obviously, since Eggl has no evidence that Willett harbored discriminatory animus, she cannot establish the second element of her cat's paw theory–that Willett's animus was the proximate cause of her termination; and she must establish both to make her theory viable. *Johnson v. Koppers, Inc*., 726 F.3d 910, 914.

the other employees are similarly situated because they also made the same resident use a bed

pan on occasion. But Eggl was not accused of abuse for using a bed pan–she was allegedly

abusive in the manner in which she did so and because of the remarks she allegedly made to the

resident (as in telling the resident she would not come back to assist her). It is the abuse

allegations, not simply the use of a bed pan, that resulted in Eggl's termination, and she points to

no similarly situated CNAs who, after having abuse allegations lodged against them, were not

disciplined or terminated. Accordingly, she fails to establish the fourth prong of her *prima facie*

case.

Finally, NRV contends that Eggl cannot show that she was performing her job

satisfactorily. Eggl responds by pointing out that before the Concern Report was lodged, she had

received positive performance reviews, which is true. *See* Plaintiff's Response, Exh. D (ECF No.

39-4) (Plaintiff's performance reviews dated July 7, 2016, and April 28, 2017). NRV doesn't

dispute that Eggl received these positive reviews, but maintains that Eggl was *not* performing her

job satisfactorily *because of the allegations of abuse*. She may have been a stellar employee to

that point, but NRV argues that the substantiated allegations of resident abuse automatically

mean that Eggl was not performing satisfactorily. Stated another way, NRV argues that its

proffered, non-discriminatory reason for firing Eggl renders her prior positive reviews irrelevant.

It is well-established, and is the case here, that the issue of satisfactory performance often merges

with the question of pretext. "Because Allstate's proffered reason for Maxey's termination was

Maxey's failure to perform his job satisfactorily, the analysis of that prong of his *prima facie* case

'merges' with the question of pretext." *Maxey v. Allstate Ins. Co.*, 2020 WL 868532, at *5 (N.D.

Ill. Feb. 21, 2020) (citing *Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013)). As another

19

district court explained:

> [W]hen a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "'whether the employee was performing well at the time of [her] termination.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (quoting *Karazanos v. Navistar Intern. Transp. Corp*., 948 F.2d 332, 336 (7th Cir. 1991)). Because GEO Group's proffered reason for terminating Ms. Chaib is also the basis for its conclusion that she was not meeting employment expectations, the question of whether her performance was satisfactory merges with the inquiry into whether the stated reason was pretextual.

*Chaib v. GEO Grp., Inc*., 92 F.Supp.3d 829, 837 (S.D. Ind. 2015), *aff'd*, 819 F.3d 337 (7th Cir. 2016). Eggl points out that she received positive performance reviews prior to the time the Concern Report was lodged, but NRV argues that is immaterial, and that she was not meeting NRV's performance standards when she committed what the company concluded, rightly or wrongly, were acts of resident mistreatment. But the Court need not delve into NRV's proffered non-discriminatory reason for Eggl's termination or the issue of pretext since she fails to establish the necessary elements of a *prima facie* case and, as a result, fails to shift the burden of proof to NRV to establish that its reason is worthy of credence. *Vaughn v. Vilsack*, 715 F.3d at 1006 (only when a discrimination plaintiff can "establish all four elements" of a *prima facie* case does the burden shift to defendant to provide a legitimate explanation for the adverse action). For all of the reasons discussed, NRV is entitled to summary judgment on Eggl's pregnancy discrimination claim.

**II. FMLA retaliation and interference claims.**

Eggl asserts two FMLA claims: retaliation and interference. "The difference between a retaliation and interference theory is that the first 'requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee

his or her entitlements under the Act.'" *Sorah v. New Horizons Home Healthcare Ltd. Liab. Co.*, 2018 WL 5830753, at *2 (N.D. Ind. Nov. 7, 2018) (quoting *Shaffer v. Am. Medical Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011)). As this Court explained in *Hogan v. N. Indiana Pub. Serv. Co.*, 2020 WL 2735718, at *4-5 (N.D. Ind. May 26, 2020):

> There are two types of claims for violations under the FMLA: interference claims and retaliation claims. *Cole v. Major Hosp.*, 2014 WL 6977296, at *4 (S.D. Ind. Dec. 5, 2014); 29 U.S.C. § 2615. . . . To prevail on an FMLA interference claim, Hogan must prove that: (1) she was eligible for FMLA protections, (2) NIPSCO was covered by the FMLA, (3) she was entitled to FMLA leave, (4) she provided sufficient notice of her intent to take leave, and (5) NIPSCO denied her FMLA benefits to which she was entitled. *Guzman v. Brown Cnty.*, 884 F.3d 633, 638 (7th Cir. 2018); *Goelzer v. Sheboygan Cnty., Wisconsin*, 604 F.3d 987, 993 (7th Cir. 2010).
> . . .
>
> Employers are prohibited from wrongfully denying leave, but they are also prohibited from "interfering with" FMLA rights by "using the taking of FMLA leave as a negative factor in employment actions and discouraging an employee from using such leave." *Baer v. Wabash Ctr., Inc.*, 2016 WL 1610590, at *2 (N.D. Ind. Apr. 21, 2016) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015)).
> . . .
>
> Turning to the FMLA retaliation claim, NIPSCO argues that Hogan's complaint "belies her FMLA retaliation claim because, as Plaintiff alleges, NIPSCO terminated Hogan not in retaliation for submitting FMLA paperwork, but because it believed she falsified a Sick Leave Claim Form." . . . This argument fails for the same reason its counterpart argument failed with the ADA claim. There is still a possibility that Hogan can prove NIPSCO retaliated against her for taking FMLA leave when it fired her. The fact finder will have to determine whether the real reason for her termination was falsifying the forms, or illegal action under the FMLA–that is not the court's purview.

*Hogan*, 2020 WL 2735718, at *4-5 (N.D. Ind. May 26, 2020). The circumstances and result are the same in this case.

NRV's argument in support of summary judgment on Eggl's FMLA claims is singular

and straightforward. NRV contends that "Eggl has failed to prove that NRV interfered with her

FMLA request or retaliated against her for taking FMLA for the same reasons discussed with

regard to her discrimination claim, i.e., Eggl was terminated based on a substantiated allegation

of resident abuse." Defendant's Brief in Support, p. 2.

NRV insists it is entitled to summary judgment as to Eggl's FMLA interference claim

because it had a legitimate, nondiscriminatory reason to fire her and "'[a]n employer may fire an

employee for poor performance if she would have been fired even absent her leave.'" *Id*., p. 12

(quoting *Baker v. Enter. Leasing Co. of Indianapolis*, 2012 U.S. Dist. LEXIS 135331 (S.D. Ind.

Sept. 21, 2012)). And NRV insists it is entitled to summary judgment as to Eggl's FMLA

retaliation claim for the same reason: "she cannot show that she was terminated as a result of

[requesting FMLA leave]. Rather, . . . Eggl was terminated for a legitimate, non-discriminatory

reason, i.e., a substantiated complaint of resident abuse." *Id*., pp. 12-13.

Eggl argues that the temporal proximity of events gives rise to a reasonable inference of

discriminatory intent. Plaintiff's Response, p. 17 ("there was suspicious timing between Eggl's

submission of her request for FMLA leave . . . and the decision to suspend and terminate her.").

As NRV acknowledges in its recitation of undisputed facts, Eggl testified in her deposition that

she relayed her intent to take FMLA leave as early as September 20, 2017, and submitted at least

some FMLA paperwork two weeks before she was fired:

> Eggl testified she asked Ms. Willett about FMLA paperwork around September
> 20, 2017. She further testified that on October 4, 2017, she handed Heather Frost
> the FMLA paperwork. Ms. Frost was the Scheduler for North Ridge Village. On
> November 6, 2017, Eggl's healthcare provider, Women's Health Advantage,
> faxed Defendant a copy of Eggl's completed FMLA paperwork.

Defendant's Brief in Support, pp. 4-5. The record shows, then, that Eggl inquired about FMLA

leave about one week before the Concern Report was lodged, delivered FMLA paperwork to another NRV employee on October 4, was suspended on October 6, and was fired on October 17. While NRV acknowledges the unfavorable optics resulting from the proximity of Eggl's request and her termination, it maintains that its proffered nondiscriminatory reason for firing Eggl negates any inference of suspicious timing. And while it is true, as NRV argues, that "'temporal proximity alone is 'rarely sufficient' to establish causation[,]'" Defendant's Reply, p. 4 (quoting *Castro v. DeVry Univ., Inc*., 786 F.3d 559, 565 (7th Cir. 2015)), it is also true, as Eggl argues, that "'[o]ccasionally . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible[,]'" Plaintiff's Brief in Opposition, p. 17 (quoting *Loudermilk v. Best Pallett Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (termination on the same day employee engaged in protected activity was sufficiently suspicious timing to create genuine issue of fact that the termination was unlawful retaliation[.]")). Eggl notes that "'[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, [courts] typically allow no more than a few days to elapse between the protected activity and the adverse action.'" *Id*. (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). Eggl stresses that "'[t]he closer two events are, the more likely that the first caused the second.'" *Id*. (quoting *Loudermilk*, 636 F.3d at 315). Eggl also cites to the cases of *Casna v. City of Loves Park*, 574 F.3d 420, 422-23 (7th Cir. 2009) (a one-day time period between the employee's complaint and supervisor's recommendation to fire was sufficient by itself to show causation), and *McClendon v. Ind. Sugars Inc*., 108 F.3d 789, 796-97 (7th Cir. 1997) (three-day time period between employee's complaint and his discharge was sufficient timing to show causation). *Id*., pp. 17-18. As this Court has explained: "There may be an exception to this general rule when the adverse action

23

occurs 'on the heels of protected activity,' [but] such a circumstance would be limited to matters occurring within days, or at most, weeks of each other." *Sturgill v. Schneider Elec.*, 2019 WL 2423073, at *9 (N.D. Ind. June 10, 2019) (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008); *Kidwell*, 679 F.3d at 966 ("For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action.")); *see also, Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (finding a nine-day interval sufficient to infer retaliation). The temporal proximity, however, must be "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

In this case, the suspicious timing of Eggl's protected activity and her termination gives rise to genuine issue regarding the reason for her discharge, which in turn gives rise to an issue of credibility. Stated another way, after examining the evidence as a whole, a jury could reasonably conclude that NRV interfered with Eggl's rights under the FMLA and/or retaliated against her for requesting FMLA leave. To arrive at such a conclusion, though, a jury would have to determine whether NRV's proffered nondiscriminatory reason for firing Eggl was legitimate–a determination that is beyond the purview of the Court. In this analysis, the veracity of the allegations in the Concern Report is irrelevant. The issue is whether NRV fired Eggl because it honestly believed the allegations had merit or because Eggl was seeking FMLA leave. NRV insists that "Eggl cannot show that NRV did not honestly believe its stated reason for terminating her employment." Defendant's Reply Brief, p. 5. That may be so, and the Court agrees that is the ultimate issue, but a jury will have to decide it. At this juncture the Court's duty is to examine the evidence as a whole, including circumstantial evidence, draw all reasonable inferences in favor

24

of Eggl, and determine whether a reasonable jury could find that Eggl was fired for exercising her rights under the FMLA. Applying that standard, the Court concludes that Eggl's FMLA claims survive summary judgment.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by Defendant North Ridge Village (ECF No. 23) is GRANTED in part (as to Plaintiff's Pregnancy Discrimination Act claim), DENIED in part (as to Plaintiff's FMLA claims), and DENIED AS MOOT in part (as to Plaintiff's post-employment retaliation claim).

Date: July 20, 2020.

  /s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana